U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

**FILED**

OCT 1 7 2008

CLERK, U.S. DISTRICT COURT
By_____
        Deputy



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| SHERYL D. RIDENHOUR, | § | |
| PLAINTIFF, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:08-CV-156-A |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| COMMISSIONER OF SOCIAL SECURITY, | § | |
| DEFENDANT. | § | |

### FINDINGS, CONCLUSIONS AND RECOMMENDATION
### OF THE UNITED STATES MAGISTRATE JUDGE
### AND
### NOTICE AND ORDER

This case was referred to the United States Magistrate Judge pursuant to the provisions of

Title 28, United States Code, Section 636(b). The Findings, Conclusions and Recommendation of

the United States Magistrate Judge are as follows:

### FINDINGS AND CONCLUSIONS

A.      STATEMENT OF THE CASE

Plaintiff Sheryl D. Ridenhour brings this action pursuant to Section 405(g) of the Social

Security Act, Title 42 of the United States Code, for judicial review of a final decision of the

Commissioner of Social Security denying her claim for disability insurance benefits under Title II

of the Social Security Act. Ridenhour applied for benefits on February 9, 2005, alleging disability

beginning April 20, 2004 due to carpal tunnel syndrome, right shoulder and arm pain, back pain,

depression, and anxiety. (Tr. 59). She remained insured for purposes of disability insurance benefits

through December 31, 2006. (Tr. 56).

After her application for benefits was denied initially and on reconsideration, Ridenhour requested a hearing before an administrative law judge (the "ALJ"). ALJ William Helsper held a hearing on December 21, 2006, in Fort Worth, Texas. (Tr. 779). On March 22, 2007, the ALJ issued a decision that Ridenhour was not disabled and was not eligible for disability insurance benefits. (Tr. 23-31). The Appeals Council denied Ridenhour's request for review of her case, leaving the ALJ's decision to stand as the final decision of the Commissioner. (Tr. 5).

B. STANDARD OF REVIEW

The Social Security Act defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed. 20 C.F.R. § 404.1520. First, the claimant must not be presently working at any substantial gainful activity. Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit. 20 C.F.R. § 404.1527. Second, the claimant must have an impairment or combination of impairments that is severe. 20 C.F.R. § 404.1520(c). At the third step, disability will be found if the claimant's impairment or combination of impairments meets or equals an impairment listed in the appendix to the regulations. *Id.* § 404.1520(d). Fourth, if disability cannot be found on the basis of a listing alone, the impairment or impairments must prevent the claimant from returning to his past relevant work. *Id.* § 404.1520(e). And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* § 404.1520(f); *Crowley*

*v. Apfel,* 197 F.3d 194, 197-98 (5th Cir.1999).

At steps one through four, the burden of proof rests upon the claimant to show he is disabled. If the claimant satisfies this responsibility, the burden shifts to the Commissioner at step five of the process to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Crowley*, 197 F.3d at 198. A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id.* A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.*

C.    ISSUES

1.    Whether the Commissioner properly evaluated Ridenhour's severe impairments; and

2.    Whether the determination at Step Five is supported by substantial evidence.

D.    ADMINISTRATIVE TRANSCRIPT

1.    Medical History

The administrative transcript provides the following information about Ridenhour's disability claim:    Ridenhour consulted with Ed Cerday, M.D., in May 2004 after injuring her right arm at work. (Tr. 107-25). She complained of pain in her right shoulder and arm, especially her wrist, which she rated between 8 and 10 in severity (with 10 representing the most severe pain). (Tr. 107,

121). On examination, Ridenhour exhibited decreased rotation in her shoulder, spasms in her right forearm spasm, decreased grip on the right, and positive Tinel's and Phalen's signs.[1] (Tr. 119, 112, 107). Cerday diagnosed carpal tunnel syndrome and prescribed conservative treatment, including medication, splints and therapy. (Tr.108). X-rays revealed probable bursitis in Ridenhour's right shoulder. X-rays of her elbow, wrist and forearm were interpreted as normal. (Tr. 116-17).

Beginning in June 2004, Ridenhour sought treatment from Clarence J. Brooks, M.D. (Tr. 352-417). Brooks prescribed pain medication and muscle relaxers, and ordered additional diagnostic studies and a surgical consultation. Ridenhour was also enrolled in a physical therapy program, which she attended from June 2004 through May 2005 with limited success. (169-254, 356-366).

Magnetic resonance imaging (MRI) of Ridenhour's right shoulder in July 2004 showed acromioclavicular (A-C) joint degeneration with evidence of impingement,[2] but no evidence of a rotator cuff tear. (Tr. 408). The MRI of her cervical spine found diffuse disc bulges and degenerative changes at C5-C6 and C6-C7 that resulted in central canal and bilateral foraminal canal narrowing. (Tr. 407).

Ridenhour was referred to physical medicine and rehabilitation specialist Stephen Becker, M.D., in July 2004. She complained of numbness, tingling, and weakness in her right upper extremity, with pain radiating from her right wrist to her shoulder and trapezius. (Tr. 137). On

---

[1] Tinel's sign refers to a tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1741 (31st ed. 2007). Phalen's sign or Phalen's maneuver detects carpal tunnel syndrome. *Id.* at 1117. The size of the carpal tunnel is reduced by flexion, extension or compression of the affected wrist for 30 to 60 seconds. *Id.*

[2] Impingement involves pathologic changes resulting from mechanical impingement against the rotator cuff. *Id.* at 1859.

examination, her cervical range of motion was within normal limits, but Ridenhour was tender to palpation along her cervical spine. Strength in her right upper extremity was 5/5, but 4/5 at her right wrist. Sensation was decreased over the right thumb and the fourth and fifth fingers on her right hand and the medial aspect of her right arm. Electromyography (EMG) and nerve conduction studies confirmed moderate right median nerve entrapment of the right carpal tunnel. (Tr. 132). The EMG and nerve conduction study showed no evidence of peripheral neuropathy, ulnar entrapment, or radiculopathy of the right upper extremity. (Tr. 132-33). Becker recommended a right-side carpal tunnel release, and Deepak Chavda, M.D., performed the surgery in September 2004. (Tr. 335).

Ridenhour was referred to psychologist William Hester, Ph.D., in August 2004 for a behavioral medicine consultation. (Tr. 145-55). Ridenhour reported that her primary care physician had prescribed Effexor after she complained of depression related to her work, and she reported that the medication helped a lot. (Tr. 148-49, 158). Ridenhour complained of continuing symptoms and marked pain as a result of her injuries. (Tr. 150-152). She also complained of increased anxiety and panic attacks after her injury. (Tr. 153). She demonstrated concrete thinking with some delay in her thought processes, and she had difficulty with simple arithmetic problems. (Tr. 152-53). Her mood was normal with an appropriate affect and she was pleasant during the interview, but the examiner observed that Ridenhour seemed to be upset and in pain from her injury. (Tr.153).

Ridenhour was evaluated by orthopedic surgeon Charles Kennedy, M.D., on October 27, 2004. (Tr.161). Kennedy opined that Ridenhour had suffered a myofascial strain and carpal tunnel syndrome as a result of her work-related injury and should continue a home exercise program. He did not recommend additional testing or surgery. (Tr. 162).

Ridenhour saw Chavda on December 27, 2004. (Tr. 270). She reported that her right hand was doing well after surgery, but her right shoulder continued to bother her. The surgical incision was healed, range of motion in her wrist and digits was normal and symmetrical, and she had good grip and pinch formation. She exhibited positive joint tenderness and rotator cuff weakness in her right shoulder, although no rotator cuff tear had been apparent on the MRI. Ridenhour agreed to undergo surgery on her right shoulder, which was performed on January 6, 2005. (Tr. 271, 319).

At a post-operative visit on March 14, 2005, Ridenhour complained of continued pain at a level of 8/10 in her shoulder. The surgical scar was well healed, and range of motion above ninety degrees elicited pain complaints. Clinical tests were negative. She was given prescriptions for an additional week of physical therapy and a Medrol Doespak. (Tr. 258). To address the reduced range of motion in Ridenhour's shoulder, Chavda also performed a right shoulder manipulation and injection under anesthesia on April 7, 2005. (Tr. 308-09).

Ridenhour saw chiropractor Can Ho on June 10, 2005, for continued pain and weakness in her right upper extremity and numbness in her fingers. (Tr. 443). She reported that she was in constant pain, which was aggravated by movement. Ho examined Ridenhour and noted moderate tenderness and mild edema of the affected area. He recommended therapy twice a week and also opined that Ridenhour was unable to return to work based on her subjective complaints and observations related to her pain and tenderness. (Tr. 445).

A June 2005 MRI of Ridenhour's right shoulder showed edema of the humeral head with signs of fracturing and healing within the last few months. There were also changes consistent with anterior dislocation and bursitis. (Tr. 438). An arthrogram of Ridenhour's right shoulder showed

several partial tears along the tendon. (Tr. 419).

Ho referred Ridenhour to Ved Aggarwal, M.D. (Tr. 439-40). Ridenhour recounted a job-related injury, followed by surgery for carpal tunnel relief and rotator cuff repair. She reported that the pain and numbness in her wrist improved after surgery. Her shoulder pain remained unchanged at a level of 9/10 and pain medication was becoming less effective. Aggarwal opined that Ridenhour needed rehabilitation and was 100% disabled and unable to work. (Tr. 439). At a follow-up evaluation on July 21, 2005, Aggarwal reported that Ridenhour was unable to tolerate activities of daily living, was unable to sleep, and was distressed by the poor results she had obtained from surgery. (Tr. 434). She had been attending therapy, which helped her pain, and denied experiencing side-effects or complications from her pain medications. (Tr. 434). Aggarwal recommended an orthopedic surgery consult. (Tr. 435).

Ho referred Ridenhour to chiropractor Mark A. Ritchie on August 18, 2005 for evaluation. (Tr. 422-432). Ritchie noted possible joint instability of the right upper extremity, muscle weakness, and atrophy. (Tr. 423). Ritchie also administered the General Pain Disability Index, which resulted in a finding within the severe range, and the Beck Depression Inventory, which indicated a moderate level of depression (Tr. 428). Ritchie opined that Ridenhour required therapeutic intervention and was unable to return to her regular work. (Tr. 423). Another MRI performed October 4, 2005, showed prominent narrowing at C5-C6 and mild degenerative changes along Ridenhour's thoracic spine. (Tr. 449-50).

Melissa D. Tonn, M.D., an occupational medicine specialist, examined Ridenhour on

December 13, 2005, to assess whether she had achieved maximum medical improvement.[3] (Tr. 474-477). On examination, Tonn observed that Ridenhour had lost at least five pounds since July 2004 and held her right arm in a guarded position. Her upper extremity reflexes remained symmetric and 2+ and comparison of her upper extremities showed no hair growth pattern changes, skin coloration changes, allodynia, or hyperhydrosis.[4] The digits on her right hand were slightly cooler than those on her left hand and she reported decreased sensation in the fifth digit on her right hand. Ridenhour did not cooperate with range of motion testing for her neck or right arm. (Tr. 475). Tonn opined that Ridenhour had evidence of extremity disuse, but did not present with all the criteria for an objective diagnosis of reflex sympathetic dystrophy/complex regional pain syndrome.[5] (Tr. 476). Tonn assessed a total upper extremity impairment of 26%, which converted to a 16% whole person impairment, (Tr. 476), and opined that there was no consistent evidence to suggest cervical involvement. Tonn recommended that Ridenhour return to gainful employment and discontinue treatment because it had been of no benefit and had served to further her pain behaviors. (Tr. 477).

Ridenhour participated in additional physical therapy between November 2005 and March 2006, consisting of physical activity, relaxation techniques, and counseling. (Tr. 480-608). It was noted that her response to therapy was complicated by depression and stress, but her affect improved

---

[3]    Tonn also examined Ridenhour in July 2004 and September 2005 and determined at each of those visits that Ridenhour had not reached maximum medical improvement. (Tr. 474, 478-479).

[4]    Allodynia refers to pain produced by a non-noxious stimulus to normal skin. DORLAND'S at 52. Hyper-hydrosis is excessive sweating. Id. at 901.

[5]    Reflex sympathetic dystrophy and complex regional pain syndrome are synonymous terms for a chronic pain syndrome most often resulting from trauma to a single extremity, and it can be triggered by even a minor injury. The most common clinical manifestations include complaints of intense pain and findings of autonomic dysfunction. SOCIAL SECURITY RULING 03-2P.

FINDINGS, CONCLUSIONS AND RECOMMENDATION OF
THE UNITED STATES MAGISTRATE JUDGE–PAGE 8

as she participated in the program. Her cardiovascular tolerance also improved with therapy, but she continued to exhibit significant guarding postures. She was discharged from the program after twenty sessions and was scheduled to meet with a vocational counselor to develop her options for returning to work. (Tr. 483).

In January 2006, Ridenhour saw Eric Coligado, M.D., for a follow-up EMG and nerve conduction studies, which showed abnormal sensation, numbness and weakness of her right shoulder and arm. (Tr. 686-88). Coligado opined that Ridenhour's clinical presentation was consistent with complex regional pain syndrome or causalgia.[6] (Tr. 687). Ridenhour also participated in a functional capacity evaluation in January 2006 with physical therapist Stacy Fennell, P.T., who concluded that Ridenhour was capable of sedentary work, but had limitations in the strength and use of her right arm. (Tr. 722).

Aggarwal continued to treat Ridenhour through 2006 for carpal tunnel syndrome, a shoulder impairment, cervical radiculitis,[7] and cervical facet syndrome. (Tr. 610-666). He noted signs of cervical radiculopathy[8] and recommended injections to alleviate her symptoms; however, he did not schedule the injections because the cause of her neck injury was being disputed by the insurance company. (Tr. 621, 648). In February 2006, Ridenhour complained of constant excruciating pain despite taking her medications as prescribed. She denied any side-effects from her medication. On examination, Aggarwal noted redness and decreased temperature of Ridenhour's right upper

---

[6] Causalgia is another term for complex regional pain syndrome type II. DORLAND'S at 313.

[7] Radiculitis is inflammation of the root of a spinal nerve. *Id.* at 1595.

[8] Radiculopathy refers to disease of the nerve roots. *Id.*

extremity with edema of the third and fourth fingers. He diagnosed reflex sympathetic dystrophy and recommended a series of pain relief injections. (Tr. 641-642). Aggarwal performed a right stellate ganglion block[9] in March 2006, but after Ridenhour reported no relief from the procedure, Aggarwal questioned whether reflex sympathetic dystrophy was an accurate diagnosis. (Tr. 624, 636-38).

Ridenhour was referred to John Sazy, M..D., for reconstructive shoulder surgery. Sazy operated on Ridenhour's shoulder on November 8, 2006. (Tr. 675-76, 771-772). There was no rotator cuff tear or impingement, but Sazy found and repaired an avulsion of the deltoid muscle.

2.      Administrative Hearing

Born March 8, 1965, Ridenhour completed the seventh grade. (Tr. 60, 65, 782). She had worked as a secretary and cleaning supervisor, but stopped working in 2004 after injuring her right arm and hand, right shoulder, neck, and upper back. Ridenhour testified that she was right-handed, but was unable to lifting anything with her right arm since her injury. (Tr. 782). Ridenhour testified that she recently had a reconstructive operation on her right shoulder and was attending physical therapy three times a week, but the therapy and pain medications provided no relief. (Tr. 783). Ridenhour also testified that she had a herniated disk in her neck that caused radiating symptoms in her back, shoulder, arm and hand. (Tr. 784).

Ridenhour testified that she was able to lift and carry ten pounds with her left hand on an occasional basis, although her left arm was sore from overuse and compensating for her inability to use her right arm. (Tr. 784). She also testified that she could sit for thirty minutes to an hour at a

_____

[9] A stellate ganglion block provides regional anesthesia by blocking the cervicothoracic ganglion. *Id.* at 231.

time before spasms in her neck and back required her to change positions, and these spasms would take thirty minutes to an hour to subside. (Tr. 785). She testified that reflex sympathetic dystrophy in her right arm rendered her unable to work. Her reflex sympathetic dystrophy manifest itself through numbness, swelling, color changes, and temperature changes in her right arm. (Tr. 785).

Ridenhour also testified that depression and anxiety, in combination with her medication, make her cry or sleep all the time. (Tr. 786). She feels anxious, shakes, cannot deal with people, and breaks down in tears. She attended counseling, but it did not help. (Tr. 787). She was on medicine for a few months, but it conflicted with her pain medications. Ridenhour testified that pain and concern about her medical condition impaired her ability to concentrate. (Tr. 788-789).

Vocational expert Todd Harden identified Ridenhour's past work as a secretary as sedentary and skilled. Her jobs as a small products assembler and housekeeping/cleaner were light and unskilled. (Tr. 790). The ALJ then asked Harden to consider whether there was unskilled, sedentary work available for someone who had lost the use of the dominant upper extremity. Harden testified that the unskilled sedentary jobs of call-out operator (with 2,000 jobs in Texas and 26,000 in the nation) or surveillance system operator (with 500 jobs in Texas and 5,500 in the nation) could be performed. (Tr. 790).

3.     ALJ Decision

The ALJ found that Ridenhour had not engaged in substantial gainful activity since her alleged onset date through the date she was last insured for benefits, and he further found that Ridenhour had the following severe impairments: status post-carpal tunnel release; reflex sympathetic dystrophy of the right upper extremity; status post surgical repair of her right shoulder;

and cervical radiculitis and cervical facet syndrome. He found that Ridenhour had no severe impairment meeting or equaling the criteria of a listed impairment, (Tr. 25), and further found that, through her date last insured, Ridenhour was capable of sedentary work that accommodated her inability to use the dominant right upper extremity. (Tr. 26). This residual functional capacity was not compatible with any of Ridenhour's past relevant work, but relying on the vocational expert's testimony, the ALJ found that Ridenhour was capable of performing other work that existed in significant numbers in the economy. (Tr. 29-30). The ALJ concluded that Ridenhour was not disabled at any time from her alleged onset date through the date she was last insured for benefits. (Tr. 31).

E.    DISCUSSION

1.    Assessment of Severe Impairments

Ridenhour asserts that the ALJ found that she has reflex sympathetic dystrophy, but then failed to evaluate this impairment in the manner prescribed by the Commissioner. Ridenhour contends that the ALJ should have contacted her treating physicians for additional information that might be available regarding her functional limitations and should have requested a consultative examination to assess her functional limitations and residual functional capacity. She asserts that, in failing to further develop the record, the ALJ did not properly consider her severe impairment and had an insufficient basis on which to assess the impact of her reflex sympathetic dystrophy on her ability to work. Ridenhour also complains that the ALJ did not properly evaluate her credibility

The Commissioner published Social Security Ruling 03-2p, which addresses the assessment of cases involving reflex sympathetic dystrophy/chronic regional pain syndrome. The condition is

diagnosed by persistent complaints of pain, typically out of proportion to the injury or precipitating factor, and is associated with signs such as swelling and autonomic instability, including changes in skin color or temperature, sweating, or involuntary movements of the affected region. SOCIAL SECURITY RULING 03-2p. When longitudinal treatment records document persistent limiting pain in an area where one or more of these abnormal signs has been documented at some point in time since the date of the precipitating injury, disability adjudicators are advised that they can reliably determine that reflex sympathetic dystrophy is present and constitutes a medically determinable impairment. *Id.* Ruling 03-2p also recognizes that transient findings are characteristic of reflex sympathetic dystrophy and do not affect a finding that a medically determinable impairment is present. *Id.*

Ridenhour argues that remand is necessary because the ALJ failed to acknowledge that Ruling 03-2p even existed, and thus, his assessment was incomplete. Social Security Rulings are published under authority of the Commissioner and are binding on the Administration. *Hall v. Schweiker*, 660 F.2d 116, 119 n.4 (5th Cir. [Unit A] 1981)(per curiam). An agency must follow its own procedures, even if those procedures are more rigorous than what would otherwise be required. *Hall*, 660 F.2d at 119, *cited in Newton v. Apfel*, 209 F.3d 448, 459 (5th Cir. 2000). Nonetheless, procedural errors do not require remand unless substantial rights have been affected. *Mays v. Bowen*, 837 F.2d 1362, 1364 (1988). *See also Hall*, 660 F.2d at 119 (requiring a showing of prejudice resulting from agency's violation of its internal rules). Thus, the ALJ's failure to cite a specific ruling must be accompanied by a showing of prejudice to warrant disturbing the Commissioner's decision.

Although Ridenhour argues that Social Security Ruling 03-2p requires the ALJ to follow special procedures in evaluating reflex sympathetic dystrophy claims, a review of the ruling reflects that the standard five-step sequential evaluation process is applicable. *See* SOCIAL SECURITY RULING 03-2p (providing that claims in which the individual alleges reflex sympathetic dystrophy are adjudicated using the sequential evaluation process, just as for any other impairment). Ridenhour's complaints have more to do with the ALJ's overall failure to develop the record and allegations that the ALJ did not properly weigh evidence that was in the record, not his failure to comply with procedural requirements that are specific to claimants with reflex sympathetic dystrophy.

Ridenhour asserts that she has been prejudiced by the ALJ's failure to undertake a complete evaluation of her impairments. In particular, she notes that Ho, Brooks, and Aggarwal have concluded that she is disabled, (Tr. 369, 442, 665), and Aggarwal specified in June 2005 that she is "100% disabled at this time and unable to work." (Tr. 665). Ridenhour asserts that the ALJ did not acknowledge any of these opinions or the weight afforded to the opinions as required by the regulations. *See generally* 20 C.F.R. § 404.1527; SOCIAL SECURITY RULING 96-2p, 96-5p. These statements, however, are not medical opinions that must be weighed in accordance with the regulations. *See id.* § 404.1527(a)(2) (defining medical opinions). They are opinions on the ultimate issue of disability, which is an administrative determination reserved to the Commissioner; therefore, the opinions are entitled to no special significance.[10] 20 C.F.R. § 404.1527(e).

---

[10] Ho is a chiropractor. Chiropractor opinions are not entitled to the same weight and deference as medical opinions offered by acceptable medical sources. *See* 20 C.F.R. §§ 404.1513, 404.1527(a)(2). Information from other sources, however, may provide insight into the severity of an impairment and how it affects the individual's ability to function. SOCIAL SECURITY RULING 06-03p. In fact, in appropriate circumstances more weight may be given to the opinion of one who is not an "acceptable medical source" in evaluating reflex sympathetic dystrophy

Ridenhour also suggests that the ALJ should have recontacted treating sources. The ALJ has a duty to develop the facts fully and fairly, and if he does not satisfy this duty, his decision is not substantially justified. *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir.2000); *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir.1995). If necessary, the ALJ should recontact a treating physician to resolve any doubts or gaps in the record. *Newton*, 209 F.3d at 457-58. *See also* 20 C.F.R. § 404.1512(e); Social Security Ruling 96-5p. But the failure to request additional information from treating or examining sources is reversible error only if prejudicial. The claimant must establish prejudice by showing that, if the ALJ had developed the record, additional evidence would have been produced that might have led to a different decision. *Newton*, 209 F.3d at 458. Ridenhour does not identify what additional evidence the ALJ could have obtained upon recontacting any treating source that might have altered the ALJ's assessment of Ridenhour's impairments or residual functional capacity.

Ridenhour notes that the only medical opinions that the ALJ addressed were those offered by the state agency medical consultants, but he rejected these opinions in his assessment of her residual functional capacity and reached a decision that is not based on any medical opinions in the record.[11] The Fifth Circuit has found that the ALJ should usually request a medical source statement describing the types of work a claimant remains capable of performing. *Ripley*, 67 F.3d at 557. But the absence of such a statement does not, in and of itself, render the record incomplete. *Id.* Instead,

than the opinion of a treating source. SOCIAL SECURITY RULING 03-2p. But as already addressed, Ho's conclusory opinion of Ridenhour's disability is not the type of medical opinion that assists the ALJ in assessing Ridenhour's functional capacity or reaching a decision on the ultimate issue of her disability as that term is defined in the Social Security Act.

[11] The state agency medical consultants found Ridenhour capable of a greater range of work activity, including activities requiring light exertion and occasional use of her right arm, than the ALJ found. (Tr. 459-66).

the inquiry focuses on whether substantial evidence nonetheless is present in the existing record. *Id.* Accordingly, the lack of a medical source statement from a treating or other medical source is not dispositive.

Ridenhour complains that the ALJ erred in assessing her credibility. The ALJ found that Ridenhour was restricted in her ability to work because she had lost the use of her dominant arm, but found that the balance of the evidence did not preclude the performance of any and all work-related activities. The ALJ further found that Ridenhour's subjective complaints about her symptoms, pain, and functional restrictions were exaggerated, uncorroborated, or unsubstantiated in the medical evidence and testimony. Although Ridenhour's medically determinable impairments could reasonably be expected to produce the symptoms alleged, the ALJ found that her statements about the intensity, persistence and limiting effects of her symptoms was not entirely credible. (Tr. 29).

Ridenhour argues that the ALJ failed to consider that persistent symptoms that are disproportionate to the severity of any documented precipitant are the hallmark of reflex sympathetic dystrophy. SOCIAL SECURITY RULING 03-2p. But Ruling 03-2p does not require the ALJ to take a claimant's subjective complaints at face value. As with other impairments, the ALJ is entitled to make credibility assessments about a claimant with reflex sympathetic dystrophy and weigh the evidence in the record. *See* SOCIAL SECURITY RULING 03-2p. The ALJ's decision comports with both Ruling 03-2p and the disability regulations, which provide that when an individual's subjective complaints are not supported by objective medical evidence, the ALJ must make a finding about the individual's credibility based on the entire medical record. (Tr. 26-29). *See* 20 C.F.R. § 404.1529; SOCIAL SECURITY RULING 96-7p, 03-2p. In the instant case, Ridenhour has not demonstrated that

the ALJ erred in his assessment of her credibility or that the assessment of her credibility is unsupported by substantial evidence.

Ridenhour asserts that the ALJ erred in finding that she has no severe mental impairment. The ALJ noted that Ridenhour has been treated for situational depression as part of a chronic pain and behavioral therapy program, but concurred with the state agency medical consultants who found no severe mental impairment. (Tr. 25, 28, 292). Behavioral therapy notes from Ridenhour's pain management program indicate that she was depressed and that depression, stress, and her elevated levels of pain posed barriers to her progress, (Tr. 728), but as the state agency medical consultants noted, the reports of limitation in Ridenhour's functioning and activities of daily living have been attributable to her physical impairments. (Tr. 304). The ALJ also noted that Ridenhour has not required the consistent use of antidepressants to treat her condition. (Tr. 25). The ALJ did not summarily dismiss the possibility of a mental impairment, but instead addressed the issue and found no severe mental impairment existed, which is a determination supported by substantial evidence.

Ridenhour also asserts that the ALJ did not incorporate functional limitations attributable to her cervical radiculitis and facet syndrome, even though he acknowledged that these impairments were severe and thus vocationally significant. The ALJ summarized the medical reports, including observations related to Ridenhour's cervical impairment and Ridenhour's testimony about neck spasms and neck pain radiating into her right shoulder, arm and hand. He accepted that Ridenhour had marked restriction in the use of her right upper extremity, with ongoing neck and shoulder pain, but further found that the balance of the evidence reflected no other physical conditions or limitations affecting her left upper extremity, her lower extremities, or any other body system. (Tr.

28-29). The ALJ limited Ridenhour to lifting and carrying no more than ten pounds, sitting for up to six hours per day, standing or walking for up to six hours per day, and also incorporated Ridenhour's loss of the use of her dominant right upper extremity. The ALJ's decision reflects that he was considering all of Ridenhour's impairments when he made this determination, and Ridenhour has not demonstrated that the assessment of her residual functional capacity is unsupported by substantial evidence or the result of legal error.

  2.  Vocational Evidence

  Ridenhour asserts that the vocational expert's testimony does not constitute substantial evidence because it was provided in response to a defective hypothetical. The hypothetical presented to the vocational expert must reasonably incorporate all of the disabilities recognized by the ALJ's residual functional capacity assessment, and the claimant or his representative must be afforded the opportunity to correct any deficiencies in the ALJ's question. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994). A claimant's failure to point out problems in a defective hypothetical does not salvage that hypothetical as a proper basis for a disability determination. *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001).

  Part of Ridenhour's complaint about the hypothetical question formulated by the ALJ is premised on her allegations that the ALJ did not properly assess her residual functional capacity or credibility. These arguments have been considered, rejected, and will not be revisited. The remainder of Ridenhour's argument does not involve deficiencies in the hypothetical, but challenges whether the vocational expert's testimony was responsive to that hypothetical.

  The ALJ posed a hypothetical question in which he asked the vocational expert to assume

a claimant who had lost the use of the dominant upper extremity. Ridenhour alleges that the vocational expert did not abide by these limitations, but instead testified that he was identifying suitable work by reducing "the reach hand/finger option to occasional or never to meet the requirements." (Tr. 790). She asserts that the ALJ did not ask the vocational expert about work available for occasional use of the dominant right upper extremity, only jobs involving no use of the dominant right upper extremity. She further asserts that the vocational expert's error was prejudicial because the Dictionary of Occupational Titles (DOT) indicates that the job of call-out operator requires occasional use of the upper extremities for reaching, handling and fingering; thus, the Commissioner cannot rely upon this job at Step Five to establish that there is alternative work which Ridenhour can perform. (Pl.'s Br., App. 3).

The Social Security Administration issued Ruling 00-4p to clarify the use of vocational experts and other occupational information in the disability determination process. *See generally* SOCIAL SECURITY RULING 00-4p. Ruling 00-4p places an affirmative duty on the adjudicator to inquire into possible conflicts with the DOT, but applies only to claims on which an administrative hearing has been held. Although Ruling 00-4p indicates an agency policy of placing primary reliance on the DOT, the Ruling cautions that neither the DOT nor the vocational expert's evidence will automatically "trump" in cases of conflict, and vocational experts may be used at Steps Four and Five to resolve complex vocational issues. *See id.*

The value of vocational experts is their familiarity with the specific requirements of particular occupations, including working conditions and the attributes or skills needed. *See Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986). When faced with a conflict between the vocational expert and

the DOT, the ALJ may rely upon the vocational expert's testimony provided that the record reflects an adequate basis to do so. *Carey v. Apfel*, 230 F.3d 131, 146-47 (5th Cir. 2000). The Fifth Circuit also cautions against allowing a claimant to scan the record for implied or unexplained conflicts between expert witness testimony and the voluminous provisions of the DOT and then present the conflict as reversible error when the conflict was not considered sufficient to merit adversarial testing during the administrative hearing. *Id.* at 146-47.

The ALJ erred at Ridenhour's hearing by not expressly asking the vocational expert about conflicts between his testimony and the DOT, but Ridenhour presents no patent conflict that would require overturning the Commissioner's decision. Although reaching, handling and fingering occasionally are required for the job of call-out operator, the DOT does not specify that these activities must be performed by the dominant hand or arm or require bilateral use of the arms and hands. (Pl.'s Br., App. 3). *Cf. Carey*, 230 F.3d at 146 (finding no actual conflict with vocational testimony that job could be performed with one hand because DOT did not address whether job required bilateral use of the arms and hands). Moreover, eliminating the job of call-out operator still leaves the surveillance monitoring positions, with an estimated 5,500 jobs nationwide. The ALJ's determination that Ridenhour is capable of performing other work existing in significant numbers in the national and local economies is supported by substantial evidence.

Ridenhour also argues that Social Security Ruling 83-12 provides further guidance as to the proper method of adjudication when an individual's residual functional capacity falls between two different exertional categories in the Medical-Vocational Guidelines, especially where the lower category would direct a conclusion of disabled, while the higher category would direct a conclusion

of not disabled. SOCIAL SECURITY RULING 83-12. In the instant case, however, Ridenhour would not be deemed disabled under any exertional category in the Guidelines. *Compare* 20 C.F.R. Part 404, Subpart P, app. 2, Table No. 1 (guidelines for individuals limited to sedentary work) *with id.* Table No. 2 (guidelines for individuals limited to light exertion). Additionally, Ruling 83-12 recommends the use of a vocational specialist when an individual's exertional functional capacity does not coincide with a full range of sedentary work. SOCIAL SECURITY RULING 83-12. The ALJ used the services of a vocational expert, who identified at least two occupations that would be suitable for someone of Ridenhour's age, education and functional capacity. The Commissioner satisfied his burden at Step 5 of the sequential evaluation process.

## RECOMMENDATION

It is recommended that the decision of the Commissioner be affirmed.

### NOTICE OF RIGHT TO OBJECT TO PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATION AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within ten (10) days after the party has been served with a copy of this document. The court is hereby extending the deadline within which to file specific written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation until November 7, 2008. The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made. *See* 28 U.S.C. §

636(b)(1).  Failure to file by the date stated above a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996)(en banc).

ORDER

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until November 7, 2008 to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation.  It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED OCTOBER 17, 2008.

CHARLES BLEIL
UNITED STATES MAGISTRATE JUDGE